By the Court. Bosworth, J.
The policy states that the *272 subject matter insured is “ contained in the brick building,' with tin roof, occupied as a storehouse, situate on the northerly side of, and about forty-two feet distant from, the rope-walk, Bushwick, Long Island.”
The Court of Appeals held in this case, that the words “occupied as a storehouse,” necessarily imported and constituted a warranty that the building was “ not occupied for any other purpose.” That decision leaves no question open as to the meaning of the words, or their legal effect.
The policy is dated September 6th, 1848. The building burned was put in operation on the first or second week of August, 1843. It had four floors, a basement, first and second story, and attic. The basement and first stories were used for storing hemp; the second story was used for spinning rope-yarn, by jennies impelled by steam; and the attic for preparing the hemp for the jennies. The steam engine was one of twenty-five horse power, and was in an adjoining building; the engine was used for no purpose except to operate the spinning jennies, of which there were twenty in number. Machinery for'spinning yarn was first introduced into the plaintiffs’ building in 1843, and they were the first who introduced machinery for that purpose in Bushwick; before that, spinning was done by hand. There was another building on the premises called a storehouse, which was used for storing hemp; that was called the storehouse by the people on the premises, and the building in question was called the jenny house.
There was, therefore, no controversy as to the manner in which the building in question was occupied. • In the second story twenty spinning jennies were operated by steam, and the attic was occupied by men and boys employed in hackling hemp and preparing it to be spun in the second story by machinery.
It is very obvious that a building so occupied, was not occupied exclusively as a storehouse; but on the contrary was occupied, as to the whole of two of its stories, exclusively for other purposes.
The opinion of the Court of Appeals, read on the argument before us, states, that it was contended in that Court, on the part of the plaintiffs, “that the warranty is complied with, *273 because it was partly occupied as a storehouse, and that, in order to make the warranty large enough to exclude another, but partial use, negative words were necessary,—as for instance, ‘ occupied for a storehouse only” that court said, “ we think this position is not well founded.”
The case then before that court contained all the evidence offered at the subsequent trial and rejected by this court. We understand that court as in effect deciding that the evidence did not show, nor tend to show, a compliance with the warranty.
If the contract contained a warranty that the building was occupied exclusively as a storehouse, it cannot be doubted, we think, that the evidence offered and rejected would not tend to prove a compliance with the warranty, while it was undenied and undeniable that one half of it was used exclusively for other purposes.
But it was insisted that the plaintiffs were entitled to prove “ that the term which constituted the warranty had acquired, according to the general usage of trade among rope makers, a technical meaning different from the ordinary signification of the term storehouse, and that it was occupied perfectly in accordance with the meaning of the term, as offered to be shown.” That the first, second, third, and fifth offers, were competent evidence to prove such fact, and were, therefore, erroneously rejected.
The proposition assumes that the word storehouse is not, in its common acceptation, one of equivocal import. If it had acquired the technical meaning assumed, according to the usage of trade, it must have acquired it within a few weeks prior to the date of the policy, as machinery was first used for spinning hemp in the previous August, and was then introduced by the plaintiffs. We know of no principle on which it is competent to show that a word of clear import has acquired in trade so restricted a meaning within so short a period of time. A usage, by which a word of common use and clear import, is to be so modified in its meaning as to justify a court in construing it otherwise than according to its natural and commonly accepted import, must have had an existence of longer duration than can be claimed for the one offered to be proved,
*274 Beyond the purpose of showing that the word storehouse was in some instances used as indicating a building not exclusively occupied as a storehouse, according to its natural and most common acceptation, and that in this case it was used in its restricted import, the point of the offers is simply to show, that the plaintiffs applied to have the property contained in this building insured, describing the building as a storehouse, but on a statement of the exact character of its occupation, and that it was insured by this designation of the building, both parties to the contract understandingly so naming it; that if it can be made to appear, that both parties, with a full knowledge of its occupation, consented to call it in their contract a storehouse, then although in law the contract is, that it was used exclusively as a storehouse, and if the parties are to hold to the contract according to its legal effect, the plaintiffs cannot recover; yet as they agreed to call this building, knowing how it was used, and as thus used, a storehouse, there is no strict warranty that it was used as a storehouse only, and the plaintiffs may recover. This would be altering the legal effect of a contract by proof, that the parties to it, knowingly and designedly called a manufactory a storehouse.
We regard all the views pressed upon us in favor of admitting the rejected evidence, as conflicting with the decision made by the Court of Appeals. Treating the contract as being what that Court has adjudged it to be, and the words used in it, “occupied as a storehouse,” as necessarily importing and amounting to a warranty, that the building was not occupied for any other purpose than a storehouse, the evidence offered and excluded was not admissible. The motion to set aside the nonsuit and for a new trial must, therefore, be denied.
Slosson, J. dissented and delivered the following opinion.
Slosson, J.
On a former trial of this cause, a motion for a nonsuit was made upon the ground, among others, that the words “ occupied as a storehouse,” constituted a warranty that the building was to be exclusively occupied as such. The motion was denied by the presiding judge, and his ruling sustained by the court in full bench. From this decision an *275 appeal was taken to the Court of Appeals, which tribunal reversed the judgment of this court, and held that the words in question did constitute an express warranty of the exclusive occupation of the buildings for the purpose of a storehouse.
The case came back for trial, and on the last trial the plaintiffs offered to show, among other things, “ that the defendants, in effecting this policy, waived a written application as required by their policy, and made no survey, but accepted in lieu thereof a survey made by the Contributionship Insurance Company, and made out the policy (in suit) from a survey in the possession of said Contributionship Insurance Company, and from the description contained in a policy made by said Contributionship Insurance Company on the very same building, which survey and policy exhibited the character of the buildingand further, as tending to the same point, “ that the defendants had notice of the actual occupation of the plaintiffs’ storehouse with the machinery in it, and made the policy with reference to such occupation.” He also offered to show “ the circumstances under which the contract was made, and the subject-matter to which it referred, for the purpose of showing the sense in which the terms of the policy, 1 occupied as a storehouse,’ were intended to be understood by the parties, and what the understanding was, as to the basis of their contract.” The point of the offer was, to show, that with an exact description of this building, with its machinery and mode of occupation before them, contained in a survey which they had adopted as their own, and in lieu of any application on the part of the plaintiff (which would, if true, have contained the like description), and which they expressly waived, the defendants- made the policy in suit; and thus to affix to the term “ storehouse,” as used- in the policy, the meaning as between the parties, of a building occupied and used as the one in question, was, in fact, occupied and used. The several propositions in the 4th, 5th, and 6th offers, all tend to this same point,, and may in, the argument be considered as one.
The offer was overruled, and- a nonsuit directed, with liberty to the plaintiff to move the court at General Term to set the , same aside.
On the argument before us at General Term on this motion *276 to set aside the nonsuit, the points principally relied upon by the plaintiffs were .those arising upon- the rejection of this offer of testimony, and the rejection of an offer to show usage in the plaintiffs’ trade, affecting the character and nature of the occupation of buildings of the description of storehouses.
A majority of the court interpreting the decision of the Court of Appeals, as in effect declaring that the words “ occupied as a storehouse,” constituted a warranty that the building was occupied for no other purpose than that of storage of goods, in the common accetaption of the words, have given judgment for the defendants, refusing to set aside the non-suit.
On the question of the admissibility of the evidence of usage as offered to be shown, I am not disposed to differ from my brethren (though the question cannot be said to be free from doubt); but I feel constrained to dissent from them on the other point, and am -of opinion that it was entirely competent for the plaintiff to show, as he proposed in his offer to do, that the word “ storehouse” was adopted by the parties to the policy, as descriptive of the building, in its actual condition of occupancy, as described in the policy and survey made by the Contributionship Insurance Company.
Conceding that the words “ occupied as a storehouse,” constitute a warranty on the part of the plaintiff as to the exclusive character of the occupation of the building, I do not, nevertheless, understand that the decision of the Court of Appeals necessarily affixes to the term storehouse” any determinate absolute meaning, to the exclusion of all evidence tending to show that the parties, in adopting that word in the policy, in fact intended and designed a building, used and occupied in the precise manner in which this building was used and occupied; in other words, intended and designed the very building which the plaintiff claims is designated by the word “ storehouse” in this policy. That Court could certainly never have intended to determine what should be the exact character of the building designated a “ storehouse” in this policy, nor to decide that the word should be understood only in one sense, whether that be called its popular one or not, to wit, in the sense of a building for the storage of goods exclusively.
*277 Apart from the objection, that such a determination would assume to exist, a knowledge in the court, as a court, of the exact meaning of the word in the plaintiffs’ trade, as in all other trades, a thing manifestly impossible, it is liable to this further objection, that it would preclude all possibility of recovery on the part of the plaintiff, in case the building should be occupied in any degree whatever, for any purpose, other than that thus assumed to be its universal use, and thus entirely defeat the actual intention of the parties to the contract, as proposed to be shown.
The truth is, that it is not necessary, in order to sustain the decision of the appellate court, that any exclusive meaning whatever, should be attached to the word in dispute. The question in difference between the court below and the appellate tribunal, was simply, whether the words “ occupied as a storehouse,” in the connexion in which they stand in the policy, constituted a representation, or a warranty. The difference between the two is essentially great, and presented a question of no little difficulty,, yet by no means necessarily involving the meaning of the particular words embraced in the-stipulation. The words, from their position, or relation to the context, may well amount, when taken together, to a warranty, and yet their meaning, individually, be left to be construed by the same rules which apply to words in a stipulation, not amounting to a warranty. “ Since the real meaning of a warranty” (says Phillips) “is not always the literal meaning of each word and phrase, it is surely sufficient in this contract, as in others, that an express provision has been complied with according to its real meaning, ascertained by the established, rules.” And again, “ Though a strict compliance with a warranty is required, yet the construction of the language is determined, as in other cases, by usage and common acceptance.”' (Phil. ch. 9, 52.)
While, therefore, I admit, that a literal compliance with this warranty must be shown, I hold that the question of what the word “storehouse” means in this policy, is equally open, as though the stipulation did not amount to a warranty, and that the rules of evidence relating to the construction of words or sentences in a contract, are as applicable to this as to cases- *278 not subject to this somewhat extraordinary doctrine of warranty.
It is one thing to ascertain the true intent and meaning of certain words, as between the parties to a contract, and another to determine whether the words, when thus defined and explained, amount to an express warranty; the decision of the latter question is not necessarily dependent on the former, and if á legitimate exposition of the meaning of the words, as construed by the rules of evidence applicable to the case, would show a compliance with the warranty, there is no reason, and should be no rule, which should deprive the plaintiff of the benefit of it.
If evidence would be admissible to show that the term “storehouse,” as used in this policy, supposing no warranty to exist) was intended by the parties as descriptive of the very building in question, occupied and used as it actually was, there can be no reason why it should not be equally admissible, though the terms, “ occupied as a storehouse,” may amount to a warranty that it is exclusively occupied as such. : 1
That such evidence, if of a proper degree, would be admissible, apart from this objection of the warranty, I shall endeavor hereafter to show. Does this objection legitimately constitute an obstacle to the admission of the evidence ? It can only do so by affixing to the term, “ storehouse,” a meaning which must necessarily exclude evidence of any other meaning.
This would be an arbitrary act on the part of the court, not called for by any necessity either of construction, or arising from the rules of evidence, and (if there be any truth in the evidence offered by the- plaintiff') actually defeating the undoubted intention of both parties to the contract, at the time it was entered into.
If the Court of Appeals have adopted such a principle in their decision, it is with great respect submitted, that it cannot be reconciled with the wholesome natural rule of interpretation laid down as above by Mr. Phillips ; but I do not understand that court to have done this, whatever criticism may have been expended upon the learned opinion delivered in the case.
Indeed, if I have not misapprehended the meaning of Mr. Selden’s letter read to us on the agreement, that court did not *279 intend to decide that the question of whether the building was, in fact, occupied as a storehouse, should be withdrawn from the jury, but that it was still open to the plaintiff to show by proper evidence, if he could, that the warranty was complied with; in other words, that the case was open to the application of all the ordinary rules of evidence, equally as though the words in question did not constitute a warranty.
It certainly cannot be the desire of courts, nor would it be consistent with justice, to push this doctrine of warranty beyond its present bounds, or to give it an unnecessarily stringent operation. It is severe enough as it stands, and doubtless often operates to defeat the very end both parties had in view in entering into the contract. An eminent writer on the law of insurance, remarks, respecting warranties, that they are remarkable exceptions “ to the rule which makes it the duty of the court to adopt the construction that in their judgment shall best correspond with the real intention of the parties.” And wé may well wonder how any exception to such a rule could ever have found favor with any court. In respect to these, warranties, the writer adds, “ A rule of strict and literal interpretation has unfortunately been adopted, by which it must be1 confessed, the intentions of the parties are liable to be defeated.” (1 Duer Ins., Lee. 2, part 1, § 1.)
It is enough to decide that, “occupied as a storehouse,’? amounts to a warranty that the building was so occupied at the date of the policy, and even exclusively so occupied, without also determining that the word “ storehouse” meant, in this policy, nothing else than a house for the storage of goods exclusively. That the warranty is of exclusive occupation, I am not at liberty to deny; hut to what description of building this exclusive occupation applies, is quite another question. Good sense requires that it be applied to that building, and that alone, which was in fact within the intention of the parties to the contract; and if it he argued that the warranty would become senseless unless you affix to the term “ storehouse,” the meaning of a building appropriated exclusively to the storage of goods, I answer—
First. This is not true, since there are many modes of occupation specified in the proposals or classes of hazard annexed *280 to the policy, besides that of mere-storage, and besides that to which this building was, in fact, appropriated, against which it would still be the province of the warranty to protect the company.
Secondly. The parties have not themselves thus defined the word, which they might have done had such been their understanding of it. And
Thirdly. Thus to argue, is to argue in a circle, and is equivalent to saying, the word means thus, because it is a warranty, and it is a warranty," because the word means thus. It is, in other words, making the words in question a warranty from an assumed meaning of the term “storehouse,” and then absolutely affixing that meaning to it, in order to sustain the warranty.
If it be said, that unless varied by the context, or by usage, the words in the policy are to be understood in their ordinary popular sense, it may well be replied—•
First. How can a popular meaning be predicated of a term which has its origin exclusively in mercantile custom? In Langdon v. N. Y. Eq. Ins. Co., 1 Hall, 226, Judge Oakley, in giving the opinion of the court, says: “ It is difficult to affix any precise meaning to the word ‘ storing,’ as used in the policy. Its import is, in a degree, vague and uncertain.” The whole question in that case turned on the meaning and true construction of that word. There is no more ambiguity in the word “ storing” than in the word “ storehouse.” It is a word which, from its very nature, is susceptible of different or modified meanings, as it is used in different trades and occupations. It was alleged on the argument, and not denied on the other side, that there existed a great variety among the different trades, in the mode in which storehouses were actually occupied—that in some storehouses for produce, it is customary to have a steam-engine, with wheel and fixtures, attached to the building, as a part of it, for the purpose of elevating the grain ; that a storehouse for provisions is partly appropriated to the purposes of packing, and that a sugar storehouse is, in part, appropriated to. the uses of a cooper’s establishment. This shows that though the word, as a general term, may have in one sense a popular meaning, it is, in fact, to be understood in *281 matters of contract, according to the circumstances in which it is used, and the subject to which it is applied. Can there be a doubt, for example, that in a policy on provisions contained in a building ■“ occupied as a storehouse” (in the very words used in that now in suit), the warranty would be construed as applying to a storehouse in which packing is conducted % Any other rule would defeat the policy, and the undoubted intention of the parties.
Secondly. The rule is not absolute, nor does it supersede another rule hereafter to be noticed, by which resort may be had to extraneous evidence, to show that in a particular instance, words bearing even a popular signification are used in a qualified or peculiar sense.
Upon the whole, I am unable to perceive why the circumstance that the words in question, constitute together a warranty, should exclude evidence of interpretation of the meaning of the term “ storehouse,” which would otherwise be applicable; and I, therefore, proceed to consider the question, whether this is a case in which, supposing the warranty itself to constitute no objection, the party would be at liberty to look out of the contract in order to affix to the term in question a distinctive meaning; or, to speak more accurately, in order to explain the meaning and sense in which the parties, in fact, used the word in this particular instance.
It may be admitted that usage has not affixed any peculiar meaning to the term. It is also assumed for the argument, that the word has, in some sense, a popular meaning, and that the evidence sought to be introduced will qualify or vary such meaning; and then the question is, is such evidence admissible ? It should be borne in mind that it is not invoked for the purpose of substituting other language in the contract, nor of contradicting that actually used, but to explain and apply the contract, and to determine its trae meaning as between the parties to it.
It is a part of the express provisions of the policy that it is. made, and accepted in reference to the terms and conditions annexed to it, and which are to be used and resorted to, to explain the rights and obligations of the parties in all cases not otherwise provided for in the policy-.
*282 The very first of these conditions requires that application for insurance on property out of the* city should be in writing, and should minutely describe the building insured, or containing the property insured, and “how it is occupied, and whether any manufactory is carried on within or about it.” The plaintiff offered to show that the defendants waived this written application, and made no survey themselves, but accepted, in lieu thereof, one made by the Contributionship Insurance Company, and the description contained in a policy made by said last named company on the same building, and which survey and policy exhibited the true character of the occupation of the building; in other words, showed precisely how the building was in fact occupied at the time, and that the policy in suit was effected upon the assumption of the truth of such description, and in reference to the occupation as thus described.
If it be true, as is thus offered to be shown, that the defendants accepted a survey or description, already made, in lieu of the application which the plaintiff, by the conditions of the contract, was bound himself to have furnished, and which they agreed to waive, or dispense with, then the case is the same as though the plaintiff had himself, in compliance with the conditions of the policy, furnished an original application in writing, containing a true description of the building, and of the character of its' occupation ; and the question then is, whether a term of description having been inserted in the policy, which does not, in its [assumed] ordinary popular meaning [admitted for the argument to exist,] convey the true idea of the building according to the description of it in the plaintiff’s application and the defendant’s survey, in both which, the building is correctly described, and upon which description, and on the assumption of its truth, the defendants in fact, underwrote the policy, resort can now be had to such survey, considered in the double light of an original application by the plaintiff, and of a survey by the Company, to show in what sense the parties, in fact, understood and used the term in question, and thus to apply thé policy to that particular subject.
The question is to be considered precisely as though the plaintiff had offered in evidence an original application made *283 by himself, in connexion with the survey made by the Company, and in both which the building in question was correctly described.
This application is not a mere form, nor does it become a blank paper, after the policy is underwritten. In cases of marine insurance, the application is in writing, and when accepted, is signed by the President of the.Company, and then becomes a binding contract between the parties. (1 Duer Ins. 107, note 4.)
In Jennings v. Chenango Co. Mutual Ins. Co., 2 Denio, 77, it is said, “ The contract between the parties is the policy, conditions and application, which are in writing.”
It is not, however, necessary for the present purpose to go so far as this. In all the cases in .which the effect of these papers has been considered, the question has been, whether they were to be regarded as representations merely, or from some reference to them in the policy, to be treated as forming part of that instrument, and constituting warranties. Their effect as evidence, to explain the language used in the policy, does not seem to have arisen in any adjudged case,
Mr. Phillips on this subject (1 Phil. 9) says, that “though the proposal, or order for insurance, or a paper shown, or words spoken at the time of signing, are not a part of the contract, to the same purpose as if the words spoken or contained in the proposal or paper therein, had been "inserted in the policy, still the contract may be affected by them, if they are such as to induce the underwriter to take the risk, and have not been waived in the policy.”
That the application is not a part of the contract, in the sense in which it would be, if expressly referred to in the policy as forming part of it, as was the case in Jennings v. Chenango Co. Mu. Ins. Co., is conceded, but it is still a subsisting document, though not incorporated into the principal instrument. It is not a mere declaration or statement by the insured volunteered by him, but a document or writing called for, by one of the conditions of the policy, and containing the particulars specified in that condition. It is submitted to the insurers, and acted upon by them, and one object of it, is, to furnish them with an exact description of the building, containing the sub *284 ject insured, and when adopted by the Company, such description becomes the description, agreed upon as true, as Between the parties, and when the policy is afterwards filled up from this description, how can its language, in case a doubt arises, be better or more safely "interpreted, than by a reference to the original application itself from which this description was taken ? So material is this application as a description of the subject, that the insurer may avoid the policy, by showing that such description is untrue in fact, and this, upon the principle that the insurance was intended to apply to the subject as described in the application; and if this description be untrue in fact, it operates as a fraud, and avoids the policy. If the insurer may refer to it, for the purpose of avoiding the contract, by falsifying the description contained in it, why may not the insured refer to it to sustain the contract, by showing that it is true, and that the policy and application both speak the same language, when, as in the present case, the attempt is to avoid the policy, on the ground that the description in the latter is untrue in fact ?
It is true in the one case, it is appealed to as evidence of a fraud, or misrepresentation, on the part of the insured, and in the other as a rule of interpretation, and therefore coming within the rules applicable to evidence ; but the distinction is really technical, since the appeal, in both instances, is made upon the same assumption, which is true in fact, to wit, that the application contains the true description upon which the contract was based. In my judgment, the application constitutes, by the very requirements of the condition of the policy, the basis of the entire contract, and is made evidence, as between the parties, on all questions affecting their rights under that instrument, whether dependent upon the construction of the contract, or other considerations.
Neither do I perceive how its introduction conflicts with any rule of evidence properly understood.
The document is not offered to prove a mere parole or verbal declaration made anterior to the policy, nor conversations between the parties, nor to contradict, vary or add to the language contained in that instrument, by substituting other and different language, nor to prove any secret meaning in conflict with the *285 language of the instrument; but it is referred to for the purpose of showing in what sense the parties themselves used the word in question, and thus to define and apply the contract according to its truth (and for this purpose, parole evidence, if this is to be regarded as such, is always admissible), and the reference is to the very document, which both parties had agreed upon as containing the description from which the policy was to be drawn.
It is a reference to a collateral cotemporaneous paper, between the same parties, relating to the same subject matter.
It is not necessary to treat it as a case of mistake in description, to be corrected only in Chancery, (though even in that respect it is questionable whether it may not properly be admitted without a special action to reform the contract). (Duer. Ins., p. 311, note 23.) On the contrary, the argument assumes that the word was adopted designedly, but mutually understood in the sense in which it is explained in the application.
I have treated" the question as though an application had in fact been made by the plaintiff, in which light, the waiver of such application by the defendants, and the substitution of other evidence in its place (there being no pretence that there is any untruth in the substituted proof), renders it proper, in my view, that it should be considered.
There are many cases in which extrinsic proof is admissible, to explain the language adopted by the parties to a contract, with a view to ascertain their real intentions, though such evidence may not be absolutely necessary to enable the court to put some construction upon the instrument in which it is embodied.
One of the instances cited by the learned author of the Treatise on Insurance, to which I have already referred, in which parole evidence is admissible, to interpret the language of a policy, is that in which the evidence relates to “ extrinsic facts, showing the words to be interpreted, to have been used by the parties in a distinct and peculiar sensea sense distinct from its'popular use but in the particular case, plainly intended by the parties (1 Duer. Ins., p. 178-280). Instruments are to be *286 interpreted in relation to the subjects to which they relate, and evidence of the nature of the subject, or extrinsic evidence, is admissible as a medium of interpretation of the language and meaning of the parties. (1 Greenl. Ev., § 286; 6 Barb. Sup. C. R., 278; 1 Hill, 17.)
“ Evidence,” says Greenleaf, “ which is calculated to explain the subject of an instrument, is essentially different in its character from evidence. of verbal communications respecting it.”
The rule is well expressed in French v. Carhart, 1 Coms. R. 96, p. 102.
“ Too much regard is not to be paid to the proper and exact signification of words and sentences, so as to prevent the simple intention of the parties from taking effect, and whenever the language used is susceptible of more than one interpretation, the court will look' at the surrounding circumstances existing when the contract was entered into, the situation of the parties, and the subject matter of the instrument.”
“ The proper construction of the policy,” says Duer, vol. i., p. 282, “ very often depends upon the communications relative to material facts, made by the assured or his agent, prior to its execution, and in all such cases where the representation is-not embodied in the policy, which rarely happens, it must necessarily be established by extrinsic proof.”
The cases are numerous in which, resort has been had to the circumstances under which the- contract was made, and the nature of the subject to which it is applied, in order to explain the meaning of words, or terms, which in themselves are not ambiguous, nor have a double meaning, but on the contrary have in some instances an ordinary popular signification.
Thus the word “ port” has a popular meaning, and would be ordinarily understood as the harbor or haven of .a commercial town, landlocked, or protected from the sea, yet in an action on a policy from Hew York to the port of Sisal, in Yucatan, with liberty to proceed to one other port in said province, &c., it appearing that Sisal was an open roadstead, having no harbor, and that Silam (the other port) to which the vessel proceeded, and where she was lost, was in like manner without harbor or *287 haven, and that vessels lie in the open roadstead some miles from shore, it was held in answer to the objection that the place where the ship was lost was not a port, within the meaning of the policy, that the word must be taken in reference to the subject matter to which it applied. “ It may generally,” say the court, “mean a harbor or shelter to vessels from storm; but when applied to Sisal or other trading places on the coast of Yucatan, it. cannot mean such a harbor, for it is well known, and was proved in the case, that there are none such on that coast.” (De Longuemere v. N. Y. Fire Ins. Co., 10 R. 120.)
The policy was intended to protect a vessel at Sisal, &c., described as a port; and it being shown by extrinsic evidence that Sisal was not a port in the common acceptation of that term, it was held that the policy should be interpreted according to the nature of the subject to which it was intended to apply, and therefore the word was held a good description in the qualified sense called for by the evidence, as being the one in which it was understood by the parties. Other instances might be cited, but this is sufficient for illustration.
The offer of the plaintiff is to show in the present case, the circumstances under which the insurance was effected; that the building to which the derm “ storehouse” was applied in the policy, was the building described in his application (or in the survey or other paper mentioned in the offer as substituted in the place of the application), that its character and occupation were fully disclosed by these documents to the defendants, who thereupon underwrote the policy in suit, describing the same building, in its mixed character, or mode of occupation, as a “ storehouse,” and by this proof, to put the court in the situation of the parties at the time of making the contract, and thus enable it to determine what the parties intended and understood, by the term in question. It is not an offer to substitute other language in place of that used, but to determine the meaning of the latter, and interpret it according to the subject matter, and thus to apply it to the building, and the only building (so far as the case shows) in the contemplation of the parties.
I cannot see the objection to this evidence: its introduction *288 violates no sound rule, wMle it effectuates the true intention of the parties.
The case of Etches v. Aldan,, 1 Manning & Ryland, 17 Com. Law R. 229, is in point.
■ The real plaintiff (one Sharpe, for whom Etches as agent had effected the insurance) chartered his vessel to Aikin on a, voyage, the probable duration of which was eight months, at £100 a month, which would make the gross freight payable to Sharpe, had the voyage been successful, £800. Aikin was to advance all necessary sums for sailing charges, &c., to be credited on account of the freight (such charges being payable' by Sharpe). Sharpe and Aikin cotemporaneously effected insurance with the defendant, Sharpe, to £400, on his freight, and Aikin to £350, to cover his advances, &c. (which had been actually made to the amount of £270), and the Company were at the same time informed what was the nature of the contract between the two, and a calculation was entered into between them and the Company, “by which' it appeared that the voyage would extend to eight or nine months, and that after the sailing charges, Aikin would have to pay £400, or £450 (the difference between the amount of advances, say £350, and the whole freight £800), on the safe arrival of the vessel, and the Company perfectly understood the calculation.”
The defence was, that as the whole freight was £800, and the plaintiff’s insurance only £400, he was his own insurer for half the interest. They accordingly deducted the amount of the actual advance, £270, from the amount of the gross freight, £800, leaving £530 as the total amount of the loss, for one half of which they contended that Sharpe was his own insurer, and they paid the half of that amount, £265, into court.
On the trial the plaintiff proved by Aikin, the effecting of the two policies, and the explanations had with the Company at the time the insurances were effected, to show that his intention was to insure his net freight after the advances were deducted, and that the defendants in the use of the word “ freight” in the policy, so understood it. The defendant proved, that in a general policy on freight, it was usual to pay losses on the gross freight without reference to deductions for sailing charges, and they objected to the admission of plain *289 tiff’s evidence, contending that the testimony of Aikin ought not to be received, to control the widtten document declared upon, and “ that the terms of the contract ought not to be imported from another instrument.” The judge at the trial overruled the objection, and the court, on a motion for a new trial, held the evidence admissible, and that it was a plain explanation, at the time, of the species of interest to which the insurance was to apply.” In other words, the court admitted evidence of extrinsic facts existing at the time the contract was made, including the introduction of another policy, to show that by the term “ freight,” used in the policy, was intended by the parties, the net freight which would be due to the plaintiff by Aikin, after the charges were deducted, and not the gross freight, which the term used in the policy unéxplained imported, and on which, but for this evidence, according to the usage shown, the settlement would have been made, and which would have left him his own insurer for one-half his interest, and consequently only entitled to recover one-half his loss.
To the same effect is the case of Gray v. Harper, 1 Story C. C. R. 547, in which the question was, what was the trae meaning of the word “ cost ?” as between the parties, in a written contract by defendants to take of the plaintiffs certain volumes of Sparks’s American Biography “ at the cost thereof,” the plaintiffs contending that it included the amount paid by them to Mr. Sparks for his copyright; and the defendants insisting to the contrary of this, as they had, contemporaneously with their contract, purchased of the plaintiffs this very copyright; and evidence was gone into of the circumstances attending the making of the contract, including the purchase of the copyright by defendants, and including also conversations between the parties before the contract was signed. The plaintiffs claimed that the word being used without limitation, embraced every item of expense, while the defendants contended, that from the facts of the case (their purchase of the copyright) this could not have been the intention of the parties, and the case was left to the jury on these facts, to determine what was the true meaning of the word as used in the contract—not that there was any ambiguity in the word itself, nor that it had any technical meaning, but that it was proper to refer it to the subject mat *290 ter, and in the light which the circumstances accompanying the execution of the contract would throw upon the question, to determine, whether the parties intended to use it in the limited sense for which the defendants contended, or in the large and unqualified sense for which the plaintiffs contended, and in which latter sense, without such reference to the subject matter itself, it would necessarily be understood; and the learned judge, in charging the jury, told them that the word should be taken in its largest sense, unless it was clearly made out in evidence that the parties in the use of the language adopted a more limited construction ; and he said that he did “ not think” it absolutely incompetent for the parties to show, from the conversations between them at the time of the making of the contract, what was the sense in which they then understood the word “ cost” as used in the contract, as it was a word capable of a larger or narrower construction according to the subject matter, and the circumstances of the particular case; these conversations may be deemed a part of the res gestee, and thus may be referred to, as explanatory of the real intention of the parties in the use of the word.
“ It is a leading rule in regard to written instruments (says Greenleaf, § 286,vol. L), that they are to be interpreted according to their subject matter, and parole or verbal testimony must be resorted to in order to ascertain the nature and qualities of the subject to which the instrument refers.” Mr. Starkie lays down the rule in unqualified terms, that extrinsic parole evidence is admissible for the purpose of applying a written instrument to its proper subject matter, the existence of which is also matter of proof (Starkie, part 4, 1021, marg.); and I do not perceive why in all cases, whether the language of the contract be ambiguous or not, parole evidence may not be admitted to explain, or ascertain and identify the subject matter of the contract, and thus give a proper application to the written instrument. Parties contracting may, through inadvertence or otherwise, use an expression, which, in its common meaning, does not accurately convey the idea of the subject intended to be described. It need not be the case of a mistake, in which an entirely erroneous expression has been used, or a word signifying a different thing, but it is the case of an *291 expression containing the idea of the subject, yet not fully or accurately. Now, where one party attempts, by an enforcement of the stringent rule of warranty, to defeat the contract altogether, by reason of this inaccuracy, it would be not only the grossest injustice to the party thus sought to be defrauded of the benefit of his contract, but a sad reflection upon the law of evidence itself, if he were not permitted to show what the subject matter intended by the parties in the use of the terms employed, really was, and thus apply and uphold the contract, the true construction of which, is the very object sought in all the rules of evidence. More especially would this be so, when, as in.the present case, part of the evidence consists of a paper cotemporaneous with the policy itself, in which the subject is accurately and fully described, and which was mutually adopted by the parties as the basis of their contract, and from which they framed the description contained in the policy. I can find no authority which should deprive a party of such a privilege.
"Upon the whole case, I dissent from my brethren in the construction which they have given to this warranty, as operating to exclude evidence to explain the subject intended by the term “ storehouse” in this policy; nor can I assent that the Court of Appeals, in deciding that the whole sentence constituted a warranty, intended to affix any exclusive meaning to that particular term; nor do I perceive that it is necessary to give such an exclusive meaning to the word, in order to sustain the warranty. On the contrary, I think the warranty creates no objection to the admission of the evidence, and that it was improperly excluded; and that, therefore, there should be a new trial.